## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Jasper Pellets, LLC.,<br><br>           Debtor. | C/A No. 22-01409-EG<br><br>Adv. Pro. No. 22-80045-EG<br>Consolidated with Adv. Pro. No. 23-80033-eg<br><br>Chapter 7 |

| |
|---|
| CM Biomass Partners A/S, |

**ORDER APPROVING APPLICATION OF SETTLEMENT AND COMPROMISE**

           Plaintiff,

v.

Michelle L. Vieira, as Chapter 7 Trustee for Jasper Pellets, LLC,

           Defendant/Third-Party Plaintiff

v.

U.S. Bank Trust Company, N.A., as Indenture Trustee,

           Third-Party Defendant

      **THIS MATTER** is before the Court on the *Notice and Application of Settlement and Compromise* (the "Settlement Motion") filed by Michelle L. Vieira, Chapter 7 Trustee (the "Trustee") for Jasper Pellets, LLC ("Debtor"),[1] and the Objection to the Settlement Motion ("USB Objection") filed by U.S. Bank Trust Company, N.A., as Indenture Trustee ("USB" or "Indenture Trustee").[2] The Settlement Motion seeks the approval of an agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 between the Trustee and CMBiomass Partners

---

[1] Trustee Ex. A; ECF No. 397, filed Sept. 14, 2023; APA Adversary Proceeding, ECF No. 85. References to documents filed on the docket refer to documents filed in Case No. 22-01409-eg (the "Main Case"), unless otherwise designated as a document filed in the APA Adversary Proceeding or the Deposit Adversary Proceeding (as such terms are defined herein).

[2] ECF No. 402, filed Oct. 5, 2023; APA Adversary Proceeding, ECF No. 90.

A/S ("CMB") which would globally resolve the disputed pre-petition claims and post-petition claims between the parties (the "Settlement Agreement"). The hearing on the Settlement Motion was originally scheduled for October 19, 2023, but was continued due to the Indenture Trustee's requests to conduct discovery. An evidentiary hearing was held on December 7 and December 11, 2023, and the Trustee and her counsel, CMB's counsel, and USB's counsel were present. The Trustee was called as a witness to testify in support of the Settlement Motion and was cross-examined by USB's counsel. A total of 12 exhibits were introduced into evidence by the Trustee,[3] and USB introduced three exhibits,[4] including the deposition transcript of Trustee's counsel from October 23, 2023. After consideration of the evidence and testimony presented and a thorough review of the record before it, the Court approves the Settlement Agreement and makes the following findings of fact and conclusions of law:[5]

<u>**FINDINGS OF FACT**</u>

**A. Factual Background of Bankruptcy Case**

Debtor, a limited liability company organized under the laws of the state of South Carolina, is the owner of a pellet mill in Ridgeland, South Carolina (the "Pellet Mill"). The company was in the business of manufacturing biomass wood pellets but has ceased operations. Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy

---

[3] *See* Trustee Exs. A through L. As to Exhibit B (Debtor's Motion to Reject Executory Contract (ECF No. 5)) and Exhibit C (CMB Response to Debtor's Objection to POC No. 22 (ECF No. 320)), USB objected to the attachments to these exhibits being admitted into evidence on hearsay grounds. The Court ultimately allowed Exhibits B and C, together with their attachments, into evidence; however, as to the attachments, the Court sustained USB's objection, recognizing that they would not be admitted for the truth of the matter asserted but rather to support the due diligence the Trustee conducted in analyzing the estate's claims.

[4] *See* USB Exs. 1 through 3. In supplemental briefing filed at the request of the Court to address evidentiary objections prior to the hearing, the Trustee expressed concerns with the confidential nature of some information addressed in Trustee's counsel's deposition transcript (USB Ex. 1) as well as Exhibit 2 and reserved her right to seek the sealing of the hearing's transcript or the exhibit at a later date. At the hearing, the Court raised concerns with the sealing issues and the way the Trustee was seeking to proceed. The Trustee's objections to USB's exhibits were ultimately withdrawn and USB's exhibits introduced into evidence.

[5] To the extent the following findings of fact are conclusions of law, they are adopted as such, and vice versa.

Code on May 27, 2022 (the "Petition Date"). The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee of Creditors") on June 16, 2022.

USB is Debtor's main secured creditor. It served as the Indenture Trustee for certain $11,140,000.00 South Carolina Jobs-Economic Development Authority Solid Waste Disposal Revenue bonds (AMT) Series 2018 and certain $1,360,000.00 South Carolina Jobs-Economic Development Authority Taxable Solid Waste Disposal Revenue Bonds Series 2018B (the "Bonds").[6] The Bonds are secured by a mortgage, security agreement, and various other documents. USB asserts it has a perfected security interest in the Pellet Mill and all its improvements and personal property, as well as all proceeds and products thereof.[7]

CMB was a party to a contract with Debtor originally dated September 15, 2018—the *FCA Contract for the Sale and Purchase of Wood Pellet Biomass* (the "CMB Contract"). Pursuant to the CMB Contract, Debtor had agreed to sell CMB wood pellets in bulk. The CMB Contract was modified numerous times while Debtor worked on completing certain upgrades that would enable it to meet the requested production volume. The relationship between CMB and Debtor deteriorated in the spring of 2020 when the upgrades were not completed; accordingly, CMB began to reduce the price per ton being paid to Debtor to offset what CMB claimed were its damages for Debtor's alleged failure to deliver the volume of pellets required under the CMB Contract.[8]

Debtor's schedules, as amended from time to time, reflect that as of the Petition Date the company had assets valued at $25,120,557.40, including machinery and equipment with

---

[6] USB Objection at ¶ 5.
[7] *Id.*
[8] *See* Settlement Motion at p. 2; POC 22-1; and ECF No. 52.

an estimated value of approximately $20 million and real property worth approximately $700,000.00.[9]   As to Debtor's liabilities, Schedule D reflects total secured debts of $12,442,951.02, the majority consisting of debt owed to USB of over $12,000,000.00 for the Bonds.   Schedule E/F listed unsecured debts of $1,938,473.43, including priority debts of $48,935.36.

Upon filing for bankruptcy, Debtor sought to reject the CMB Contract.[10]   The parties reached an agreement as to the contract's rejection, which acknowledged that Debtor, CMB, and the Committee of Creditors were negotiating a global resolution of the amount and treatment of CMB's and Debtor's claims against one another and contemplated CMB serving as a stalking horse bidder to purchase Debtor's assets pursuant to 11 U.S.C. § 363.   A consent order reflecting that agreement was entered (the "Consent Order to Reject Contract") further contemplating that if a resolution was not reached between the parties or was not approved by the Court, Debtor would be authorized to reject the Contract without further order and CMB would have thirty (30) days from the date of the rejection notice to file a proof of claim for damages.[11]

Debtor's Claim Register reflects claims asserted against Debtor's estate in the total amount of $58,283,735.33.   Pursuant to the Consent Order to Reject Contract, Debtor filed a notice of rejection.[12]   That, in turn, triggered CMB's filing of its proof of claim reflecting an unsecured debt of $43,963,258.00 (the "CMB Claim"), consisting of asserted pre-petition

---

[9] ECF Nos. 1, 46, and 64.   The schedules were subsequently amended following the conversion of the case to Chapter 7 to include priority claims against Debtor arising subsequent to the Petition Date while the case was being administered under Chapter 11 (Schedule E/F) and to add in Schedule A/B the potential claims the estate had against CMB and possible third parties with respect to the breach of contract and other acts addressed in the APA Adversary Proceeding.   ECF Nos. 321 and 322.
[10] Trustee Ex. B; ECF No. 5, filed May 27, 2022.
[11] ECF No. 57, entered July 14, 2022.
[12] ECF No. 82, filed Aug. 23, 2022.

breach of contract and rejection damages.[13]    USB filed a secured claim in the amount of

$12,677,404.41.[14]

On February 9, 2023, Debtor objected to the CMB Claim[15] seeking its disallowance

on the grounds that the CMB Claim did not have sufficient supporting documentation and

failed to include a distinction between the portion of its claim for alleged pre-petition breaches

as compared to damages related to the rejection of the CMB Contract.  As a second basis for

the objection, Debtor argued that it had substantial claims against CMB which would in turn

offset and reduce the amount that CMB claimed.  These claims were in part based on the

underlying issues of the APA Adversary Proceeding (as described below).  CMB filed a

response disputing the legal and factual grounds for the Claim Objection.[16]  Moreover, CMB

argued that the Claim Objection failed to provide sufficient evidence to rebut the presumption

of the proof of claim's validity.  The hearing on the objection to the CMB Claim was held in

abeyance and the issues were to be resolved through the APA Adversary Proceeding.[17]

### B.  Asset Purchase Agreement with CMB

On August 19, 2022, Debtor filed a motion seeking authorization under 11 U.S.C.

§ 363 to sell substantially all its assets and seeking the approval of bidding procedures to

auction them.  The Bidding Procedures Order provided that, if the sale of Debtor's assets did

not close by November 15, 2022, USB would have relief from the automatic stay to exercise

its state law rights and remedies.[18]   CMB and Debtor entered into an Asset Purchase

---

[13] POC 22-1, filed Sept. 22, 2022.

[14] POC 16-1, filed Aug. 3, 2022.

[15] ECF No. 297.

[16] Trustee Ex. C; ECF No. 320, filed Feb. 27, 2023.

[17] ECF No. 373.

[18] ECF No. 130, entered Sept. 13, 2022.  The deadline was extended to November 15, 2022 by a subsequent Order entered on October 16, 2022.  *See* ECF No. 185.

Agreement (the "APA") on October 5, 2022, with CMB as the stalking horse purchaser.[19]  No

parties other than CMB submitted qualifying bids.  On or about October 20, 2022, Debtor, in

consultation with the Committee of Creditors, designated CMB as the successful bidder.[20]

Pursuant to the APA, CMB agreed to buy substantially all of the assets Debtor used in

connection with manufacturing wood pellets for consideration of over $24,000,000.00,

comprised of (a) cash consideration of $3,500,000.00, (b) assumption or reissuance of the

Bonds in the amount of $12,190,000.00, (c) cash paid to the Indenture Trustee in the total

amount of $2,315,606.57 for attorney's fees, interest, and past due debt service; and (d) the

agreed-upon amount of the CMB Claim.[21]  As part of the APA, Debtor and CMB agreed that

the entire amount of the unsecured CMB Claim would be reduced to $6,000,000.00 (the

"Proposed CMB Claim Settlement").[22]  As to the CMB Claim, the APA further contemplated:

> The CMB Claim amount [$6,000,000.00] is stipulated regardless of whether
> [CMB] is the Successful Bidder and shall survive any termination of this
> Agreement for any reason, but if, and only if, [CMB] is the Successful Bidder
> but the Closing does not occur because of [CMB] default, then this Section 1.5
> will be null and void.[23]

The APA also provided that a good faith deposit would be paid and held in escrow:[24]

> 2.1.2.  Prior to, or concurrently with, the mutual execution and delivery of this
> Agreement (the date of such mutual execution and delivery is sometimes
> referred to herein as the "Execution Date"), Buyer shall deposit into escrow
> with Beal, LLC, $250,000 (the "Good Faith Deposit") in immediately
> available, good funds (funds delivered in this manner are referred to herein as
> "Good Funds").  **Per the Sale Motion, the Good Faith Deposit shall become
> non-refundable upon [CMB] being selected as the Successful Bidder
> unless [CMB]'s failure to close is no fault of [CMB] or as otherwise set
> forth in this Agreement.**  Within one (1) business day of being selected as the
> Successful Bidder, [CMB] shall deposit with [Debtor]'s attorney an additional

---

[19] ECF No. 146, filed Oct. 6, 2022.  Capitalized terms, unless defined herein, shall have the same meanings
ascribed to them in the APA.
[20] ECF No. 170.
[21] APA at § 2.1.
[22] Id. at § 1.5.
[23] Id.
[24] Id. at § 2.1.2 (emphasis added in bold).

deposit of ten (10%) of the proposed Cash Purchase Price (the "Earnest Money
Deposit"). The Earnest Money Deposit shall be immediately non-refundable
unless [CMB]'s failure to close is no fault of [CMB] or as otherwise set forth
in this Agreement. For the sake of clarity, if [CMB] terminates the Agreement
pursuant to Section 4.3.3 or the Parties mutually agree to terminate the
Agreement pursuant to Section 4.3.1, the failure to close shall be no fault of
[CMB]. Upon receipt of the Good Faith Deposit and the Earnest Money
Deposit, Beal, LLC shall immediately deposit the funds into its trust account.

Both CMB and Debtor's obligations under the APA were conditioned on this Court's approval

of the sale motion.[25] As contemplated in the APA, Debtor filed a motion seeking approval of

the Proposed CMB Claim Settlement, which the Committee of Creditors supported.[26] Due to

the termination of the APA, however, the hearing on the approval of the CMB Claim

Settlement was eventually rendered moot.

The hearing on the sale of the assets was scheduled for October 25, 2022. At some

point on October 24, 2022, CMB's counsel contacted Debtor's counsel and advised that, in

communicating with the Town of Ridgeland, some concerns were raised regarding the Town

of Ridgeland's noise ordinance and Debtor's noncompliance therewith. At the scheduled sale

hearing on October 25, 2022, Debtor advised the Court that, due to the newly discovered issue

regarding the Town of Ridgeland's noise ordinance, it needed additional time to resolve the

issue with CMB; as a result, the parties requested a continuance of the sale hearing until

November 9, 2022. At the continued hearing, counsel for CMB informed the Court that the

APA was terminated pursuant to its terms on November 4, 2022, and a Notice of Termination

of Asset Purchase Agreement, along with a copy of the letter dated November 4, 2022 sent to

---

[25] See APA at § 8.3.2 ("Following the filing of the Sale Motion, the Seller shall use reasonable efforts to obtain
entry of the Approval Order. Both [CMB]'s and [Debtor]'s obligations to consummate the transactions
contemplated in this Agreement, which [CMB] and [Debtor] may hereafter enter into, shall be conditioned upon
the Bankruptcy Court's entry of the Approval Order.").
[26] ECF No. 160.

Debtor's officer and Debtor's counsel informing them of the termination, was filed with the Court.[27]  On November 16, 2022, the Court entered an Order denying the sale and concluding that "the APA is not approved by the Court".[28]

### C.  Conversion of the Case to Chapter 7

Debtor's bankruptcy was converted from Chapter 11 to Chapter 7 on February 15, 2023,[29] and the Trustee was appointed on February 21, 2023 to administer the estate.  Debtor's counsel was holding the Good Faith Deposit in escrow when the case was converted.  On March 22, 2023, the Court entered a Consent Order Pertaining to Deposit Held in Escrow (the "Escrow Consent Order"), agreed upon by counsel for the Trustee, Debtor, CMB, and USB, ordering Debtor's counsel to release the Good Faith Deposit to the Trustee, who in turn would hold the funds pending further order of the Court.[30]  The Escrow Consent Order further provided that "nothing in [the] order waives, limits or impairs any party's rights, claims or defenses to the funds on deposit."  Approximately three months after her appointment, the Trustee filed a Notice of Abandonment of Debtor's Pellet Mill, including the real estate.[31] With no objections or responses filed, the Court granted the Trustee's application to abandon the Pellet Mill.  Despite the automatic stay no longer being in effect as to USB's collateral, the Indenture Trustee has not taken any action to foreclose on it.

Following the conversion of the case to Chapter 7, counsel for Debtor and the Committee of Creditors filed their respective applications seeking approval of legal fees and expenses incurred during the Chapter 11 case,[32] which the Court approved.  Accordingly, Beal

---

[27] ECF No. 208, filed Nov. 10, 2022.
[28] ECF No. 225.
[29] ECF No. 313.
[30] Trustee Ex. I; ECF No. 345.
[31] ECF No. 384, filed May 30, 2023.
[32] ECF Nos. 202, 238, and 357.

LLC (Debtor's counsel) has a priority claim against the estate in the amount of $347,115.12,[33] and Walker, Gressette and Linton, LLC (counsel for the Committee of Creditors) holds a priority claim in the amount of $146,938.86.[34]

### D. Factual Allegations in Complaint and Counterclaims

On December 1, 2022, CMB filed a Complaint for Damages and Declaratory Relief against Debtor (the "Complaint"),[35] commencing the first adversary proceeding (the "APA Adversary Proceeding").  The Complaint seeks (a) a judgment against Debtor finding that it breached the APA, committed various forms of fraud, and engaged in unfair and deceptive trade practices; (b) a declaratory judgment that, due to the various acts, omissions, fraud, and concealment allegedly committed by Debtor, the APA is null and void, CMB's obligations thereunder are extinguished, and the $250,000.00 Good Faith Deposit should be returned to CMB; and (c) an award of compensatory, punitive, and treble damages to be awarded to CMB in an amount determined by the Court.  More specifically, the Complaint asserts a total of nine causes of actions against Debtor, including: breach of contract, violation of the South Carolina Unfair Trade Practices Act pursuant to S.C. Code Ann. § 39-5-20, fraud, negligent misrepresentation, fraud in the inducement, breach of contract accompanied by a fraudulent act, fraudulent concealment, unjust enrichment, and declaratory judgment.  In essence, CMB alleges that Debtor made representations in the marketing teaser that the facility was "turnkey" ready, when in fact it was not.  Through discussions with representatives of the Town of Ridgeland, CMB alleges it was informed of Debtor's violation of noise ordinances and of possible issues with obtaining the required licenses to continue operating the mill.  CMB

---

[33] Trustee Ex. K, ECF No. 383, entered May 25, 2023.
[34] Trustee Ex. L, ECF No. 372, entered May 9, 2023.
[35] APA Adversary Proceeding, ECF No. 1.

further alleges that the data room did not contain information regarding the violations and issues it learned about from third parties. Accordingly, CMB alleges that Debtor acted fraudulently in making misrepresentations in its marketing material and failing to include relevant information in the data room, which conduct resulted in the breach of the APA on the part of Debtor, thus excusing CMB's termination of the APA.

On January 17, 2023, Debtor filed an Answer to the Complaint raising twenty defenses and asserting five counterclaims, which was then amended once the Trustee was substituted as a party in interest.[36] The Trustee asserted the following counterclaims against CMB: (1) breach of contract for failure to pay the Earnest Money Deposit, (2) breach of contract, (3) defamation, and (4) declaratory judgment. Among other arguments and defenses, the Debtor (and subsequently the Trustee) disputed that the marketing materials contained false representations, claimed that CMB had no basis to terminate the APA because Debtor was not in default under its terms, and relied on the "AS IS" provision in the APA containing CMB's acknowledgment that it had conducted—or had the opportunity to conduct—an independent investigation and inspection of the condition of Debtor's assets and further provided, in pertinent part:

> [CMB] hereby acknowledges and agrees that, except as otherwise expressly provided in section 5 above,[37] [Debtor] makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the acquired assets including, without limitation, income to be derived or expenses to be incurred in connection with the acquired assets, the physical condition of any personal property comprising a part of the acquired assets or which is the subject of any other lease or contract to be assumed by [CMB] at the closing, . . . the value of the acquired assets . . .[38]

---

[36] APA Adversary Proceeding, ECF No. 35.

[37] Section 5 of the APA set forth Debtor's representations and warranties to CMB, which included, among others: "[Debtor] has all requisite limited liability power and authority to own, lease and operate its properties, to carry on its Business as now being conducted and, subject to [Debtor]'s obtaining the Approval Order, to execute, deliver and perform this Agreement and all writings relating hereto."

[38] *See* APA at § 7.

CMB filed a Motion for Partial Dismissal of the defamation counterclaim (the "Motion for Partial Dismissal") pursuant to Fed. R. Civ. P. 12(b)(6).[39]  The Court granted the motion, dismissing the Trustee's defamation counterclaim on July 6, 2023.[40]

On May 31, 2023, the Trustee commenced a separate adversary proceeding against CMB and USB asserting a security interest in the Good Faith Deposit and seeking a declaratory judgment as to the rights and interests of the parties to the Good Faith Deposit or any recoveries that might be obtained in connection with the APA Adversary Proceeding (the "Deposit Adversary Proceeding").[41]  The Trustee sought an order joining the Deposit Adversary Proceeding with the APA Adversary Proceeding.[42]  CMB objected on various grounds, including the fact that the claims were not ripe and were duplicative of those already raised in the pending litigation concerning the APA.[43]  USB did not object to the motion to join the two adversaries but appeared at the hearing held on June 22, 2023, and the Court granted the request pursuant to Federal Rule of Civil Procedure 42, applicable to the adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7042.[44]

After the joinder of the two adversaries, the Trustee filed an amended answer, counterclaims, and third-party complaint.[45]  Through the declaratory judgment cause of action against USB, the Trustee sought a determination that the Indenture Trustee had no lien, right,

---

[39] APA Adversary Proceeding, ECF No. 42, filed June 8, 2023.

[40] APA Adversary Proceeding, ECF No. 67, entered July 6, 2023.

[41] *See* Deposit Adversary Proceeding, Case No. 23-80033, ECF No. 1; APA Adversary Proceeding, ECF No. 62.

[42] Deposit Adversary Proceeding, ECF No. 4, filed June 1, 2023.

[43] Deposit Adversary Proceeding, ECF No. 9, filed June 12, 2023.

[44] Deposit Adversary Proceeding, ECF No. 16, entered June 29, 2023.  At the hearing, there was lengthy discussion and arguments about the applicability of Rule 42, as opposed to Rule 19 or 14.  The overriding purpose for the consolidation was efficiency given the overlapping arguments and fact.  The "consolidation" of the two adversaries was not to fully merge the two cases into one but to have two separate cases continue on the same path toward trial for efficiency purposes with the understanding, as USB's counsel acknowledged, that they could be bifurcated at any time back into two separate actions.  *See* Deposit Adversary Proceeding, ECF No. 12 at page 40 (lns. 9-17).

[45] APA Adversary Proceeding, ECF No. 62, filed June 29, 2023.

claim or interest in or to the Good Faith Deposit or any other recoveries from the APA Adversary Proceeding.[46]

### E.  Settlement between Trustee and CMB

On September 14, 2023, the Trustee filed the Settlement Motion, seeking the approval of the Settlement Agreement reached with CMB to globally resolve the disputed pre-petition and post-petition claims between the parties.  As set forth in the Settlement Motion, once the relationship between Debtor and CMB began deteriorating in the summer of 2020 with CMB reducing the price per ton being paid to Debtor to offset what it claimed to be its damaged for Debtor's failure to deliver the required volume of pellets, CMB applied reductions and offsets each month, ultimately totaling nearly $566,000.00 in reductions.  Debtor has asserted that CMB's actions had a "cascading effect which ultimately caused the business to shut down."

As to the pre-petition claims against CMB, the Trustee asserts that (a) the approximately $566,000.00 in reductions that CMB took are fraudulent transfers recoverable by the estate and (b) CMB's pre-petition conduct constitutes commercial torts believed to be worth in excess of $1 million for which CMB should be held liable.  CMB, on the other hand, denies the Trustee's assertions and contends that Debtor is liable to CMB for over $14 million for the alleged breach of the CMB Contract.  With respect to the post-petition claims, as set forth above, pursuant to the APA Adversary Proceeding, the Trustee was seeking to recover the Good Faith Deposit in the amount of $250,000.00 plus damages in an undetermined amount for CMB's alleged breach of the APA.

In the Settlement Motion, the Trustee acknowledged that continuing to litigate the APA Adversary Proceeding and Trustee's contemplated claims against CMB would be costly,

---

[46] *Id.* at ¶¶ 247-248.

time consuming, and complex, without any guaranteed recoveries for the benefit of creditors,

especially considering that the estate is currently without any funds to support the litigation.

The Settlement Motion summarizes the agreement reached between the Trustee and CMB to

settle both the pre-petition and post-petition claims as follows:

> In resolution of the Pre-Petition Claims, CMB has agreed to pay to the Chapter
> 7 Trustee the amount of $655,000.00 USD. In resolution of the Post-Petition
> Claims, the Trustee has agreed to withdraw the defense and counterclaims in
> the [APA Adversary Proceeding], will not oppose the entry of a default
> judgment in favor of CMB, and will cooperate with CMB in obtaining an order
> in the [APA Adversary Proceeding] for the return of the Good Faith Deposit
> to CMB. CMB agrees to reasonably cooperate with the Trustee as a potential
> witness regarding claims the Trustee may have or assert against the Town of
> Ridgeland and/or others pertaining to the pellet mill. Each party bears their
> own attorneys' fees and costs. Except for the obligations and requirements of
> the settlement agreement, each party fully releases the other party from all pre-
> petition and post-petition claims, known or unknown. CMB's claim for the
> return of the Good Faith Deposit is specifically excluded from the release. The
> parties agree that this settlement is a compromise of highly disputed claims,
> and no aspect of the settlement nor any of its terms shall be construed as an
> admission of liability by either party in any respect.

> As to the Deposit Adversary Proceeding, the Settlement Motion notes:

> The Trustee brought a separate adversary proceeding against CMB and the
> Indenture Trustee, which asserted a security interest in the Good Faith Deposit,
> seeking a declaratory judgment as to the rights and interests of the parties to
> the Good Faith Deposit. That adversary proceeding was eventually joined with
> the [APA Adversary Proceeding]. This settlement does not directly affect the
> Chapter 7 Trustee's separate claim for declaratory judgment against the
> Indenture Trustee; however, the Trustee believes this settlement will render her
> claim against the Indenture Trustee moot, and a motion to dispense with that
> claim will be made when appropriate.

> USB objected to the Settlement Motion on the grounds that (i) the proposed Settlement

Agreement does not provide sufficient analysis to determine whether the resolution is

reasonable, fair, equitable, and in the best interest of the bankruptcy estate; (ii) the proposed

settlement is not in the best interest of the estate or its creditors; and (iii) the settlement

improperly resolves the APA Adversary Proceeding without the Indenture Trustee's consent and, in essence, eviscerates USB's lien on the Good Faith Deposit.[47]  The Trustee filed a reply to USB's objection,[48] and the parties then filed a Joint Statement of Dispute at the Court's request.[49]  Both Debtor's counsel and the Committee of Creditors' counsel filed Responses in support of the Settlement Motion.[50]

### F.  Testimony of Trustee in Support of Settlement Agreement

At the hearing, the Trustee testified under oath about her investigation of the estate's claims against CMB and the due diligence she undertook to reach the global resolution currently before the Court.  Soon after she was appointed as the Chapter 7 Trustee, she had various calls and meetings with major parties and counsel in the case, including counsel for the Debtor and the Committee of Creditors, the United States Trustee, the Indenture Trustee, and CMB.  She also met with Mr. Knight, Debtor's principal and signatory of Debtor's schedules and statements of financial affairs.  Through those discussions and review of various documents, she familiarized herself with the events that had transpired in the bankruptcy case up to its conversion, the case docket, the APA, the circumstances giving rise to the pending APA Adversary Proceeding, as well as the pre-petition claims that CMB and Debtor were asserting against each other.

At some point in August of 2023, the Trustee and her counsel held an in-person settlement conference with CMB and its counsel and representatives.  The Trustee testified that at the beginning of the settlement negotiations, CMB started discussing their entitlement

---

[47] ECF No. 402, filed on Oct. 5, 2023; APA Adversary Proceeding, ECF No. 90.
[48] ECF No. 406, filed on Oct. 13, 2023; APA Adversary Proceeding, ECF No. 94.
[49] ECF No. 421, filed Dec. 1, 2023; APA Adversary Proceeding, ECF No. 109.  The parties also filed supplemental briefing as to the evidentiary issues noted in the Joint Statement of Dispute.  *See* ECF Nos. 426 and 427, which were resolved as set forth above.  *See supra* fn. 4.
[50] ECF Nos. 422 and 423, both filed Dec. 1, 2023.

to the Good Faith Deposit and previewed their case concerning the ongoing APA Adversary

Proceeding.  It became apparent to the Trustee early on in the conference that the parties would

not be able to reach an agreement regarding the allegations concerning the breach of the APA.

The Trustee testified that during the settlement conference there was also a "lively" discussion

regarding the pre-petition claims that the parties had against each other.  She discussed with

CMB her position that there had been wrongful setoffs by CMB against Debtor's receivables

and that CMB's conduct could be construed as a breach of good faith and fair dealing leading

to Debtor's financial demise and need to file bankruptcy.

The Trustee further testified that it was always her view that the pre-petition claims

and the post-petition litigation were separate and distinct claims and the recoveries had to be

segregated.  The Trustee further acknowledged that any recovery on the APA Adversary

Proceeding would have required additional costly litigation with USB as to its alleged interest

on those funds, and using any of the Good Faith Deposit being held in escrow to pay any of

the pre-petition claim settlement amount would similarly invite additional litigation with USB.

While she acknowledged that she was aware of USB's position as to its asserted interest in

the Good Faith Deposit,[51] the Trustee testified it had always been her position that, in order

for the Good Faith Deposit to become property of the bankruptcy estate, the APA Adversary

Proceeding would have to be litigated to its conclusion.

According to the Trustee's testimony, there were four essential terms she would

require in any agreement with CMB:  (a) a substantial payment by CMB for the estate's pre-

petition claim against it; (b) CMB's withdrawal of the CMB Claim; (c) CMB's agreement to

cooperate with the Trustee in any future litigation against third parties; and (d) her withdrawal

---

[51] *See* USB Ex. 1, pp. 18-19.

of her defenses and counterclaims in the APA Adversary Proceeding.  In reaching the global Settlement Agreement, the Trustee testified that she considered the possible recovery and success of any litigation with respect to the pre-petition claims.  Because the bankruptcy estate had no funds and proceeding with the litigation of the APA Adversary Proceeding would be incredibly expensive—with no guarantee of any recovery for creditors—the Trustee stated that she would be willing to "walk away" from the Good Faith Deposit in exchange for CMB waiving its claim against the estate and CMB's agreement to cooperate with the Trustee in possible future litigation against third parties who may have contributed to the termination of the APA through their dissemination of false information.  As she evaluated the outcome of the APA Adversary Proceeding, she also determined that because CMB was asserting claims based on Debtor's fraud, which were clearly based on disputed factual allegations, the proceeding could not be disposed of through summary judgment but would most likely have to continue to trial.  Initially, the Trustee demanded $700,000 to settle the pre-petition claims as part of the global settlement.

After the settlement conference, the Trustee testified that the only continued negotiation was over the amount of money that CMB would pay to the estate for the pre-petition claims—not over the structure of the settlement or other key terms.[52]  In her business judgment, informed by around 30 years of experience as a Chapter 7 Trustee, the settlement was a fair resolution of all claims, which eliminated the inherent risk of any continued litigation and resulted in a good recovery to the estate.  Moreover, she testified that even if the pre-petition claims did not exist and USB was not asserting an interest in the Good Faith Deposit, she would still be willing to withdraw her defenses and counterclaims to the APA

---

[52] *See also* USB Ex. 1, pp. 10-11.

Adversary Proceeding in exchange for cooperation with future litigation against third parties
and the withdrawal of the CMB Claim.

At the hearing, USB's counsel cross-examined the Trustee.  At closing, USB
reiterated and expanded on the arguments raised in its pleadings that the Trustee's release of
her claims raised on behalf of the estate in the APA Adversary Proceeding without
consideration is not fair and equitable and the Settlement Agreement unfairly terminates
USB's valid interest in the Good Faith Deposit without its consent.

## CONCLUSIONS OF LAW

The Court has jurisdiction to consider the Settlement Motion pursuant to 28 U.S.C. §§
157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  Venue
is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### A.    The Settlement Agreement Is Fair, Equitable, and In the Best Interest of
Creditors.

The Trustee seeks approval of the Settlement Agreement with CMB pursuant to
Federal Rule of Bankruptcy Procedure 9019 which provides that "[o]n motion by the trustee
and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R.
Bankr. P. 9019.  All compromises and settlements must be "fair and equitable".  *In re
Audithead, LLC*, 625 B.R. 319, 323 (Bankr. D.S.C. 2021); *In re Alpha Nat. Res. Inc.*, 544 B.R.
848, 857 (Bankr. E.D. Va. 2016) (*quoting Protective Comm. for Indep. Stockholders of TMT
Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, *rhg. denied* 391 U.S. 909 (1968)).  The burden
to establish the fairness and reasonableness of the settlement falls on the Trustee as the
proponent of the settlement.  *In re Final Analysis*, 417 B.R. 332, 341-42 (Bankr. D. Md. 2009).

At the outset, the Court recognizes that compromises are generally encouraged and
favored in bankruptcy proceedings.  *In re Meridien Energy, LLC*, No. 23-31377, 2023 WL

6542665, at *7 (Bankr. E.D. Va. Oct. 6, 2023); *see also Arrowsmith v. Mallory (In re Health Diagnostic Lab'y, Inc.*), 588 B.R. 154, 169 (Bankr. E.D. Va. 2018) ("The settlement of time-consuming, burdensome, and uncertain litigation – especially in the bankruptcy context – is encouraged.").   In determining whether a settlement should be approved, the Court must consider the following factors: (1) the probability of success in litigation; (2) the potential difficulties in collection; (3) the complexity of the litigation and the expense, inconvenience, and delay necessarily involved therein; and (4) the interest of creditors.  *In re Audithead,* 625 B.R. at 323.  "Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation."  *Id.*  A bankruptcy judge is not required to "conduct a full evidentiary hearing or mini trial" before approving a settlement. *In re Health Diagnostic Lab'y, Inc*., No. 15-32919, 2016 WL 6068812, at *3 (Bankr. E.D. Va. Oct. 14, 2016) (citations omitted).  Rather, the court must determine "whether the settlement falls below the lowest point in the range of reasonableness," and, in so doing, should approve the settlement "if it provides for 'the best possible realization upon the available assets . . . without undue waste or needless or fruitless litigation.'"  *Audithead*, 625 B.R. at 323 (quotations omitted).  Applying the four factors to this case, the Court concludes that the Settlement Agreement is fair, equitable, and in the best interest of the bankruptcy estate.

*1.    Probability of Success on the Merits*

If the Settlement Agreement was not approved, the Trustee would have to continue litigating factually complex issues with uncertainty as to any recovery for the estate and with no funds whatsoever at this point to do so.  As to the pre-petition claims, the Trustee identified avoidable transfers totaling approximately $566,000.00 and commercial torts believed to be worth in excess of $1,000,000.00.  The CMB Claim, however, asserts claims of over $43

million against the estate.  As the Trustee testified, in her judgment and 30-year experience, when weighing the viability of the claims and defenses Debtor and CMB are asserting against each other, the settlement of $655,000.00 in cash payment in resolution of these claims is fair and reasonable.

When evaluating the pre-petition claims against CMB, the Trustee testified that she believed there was a fair—yet uncertain—chance of success on these claims.  CMB had unilaterally setoff about $566,000.00 that was owed to Debtor for deliveries, claiming that the setoff was to cover its damages for Debtor's alleged breach of the CMB Contract, resulting from Debtor's failure to meet the contract volume quotas.  However, the Trustee believed that Debtor could argue CMB's interpretation of Debtor's obligations under the CMB Contract was unconscionable and unenforceable, which would give the estate a defense.  Debtor had also made assertions that the setoffs caused Debtor to have cash flow problems that had a cascading effect and ultimately led to its inability to conduct business.  In addition, there were allegations that CMB had interfered with Debtor's deliveries at the ports which had in turn impeded Debtor's ability to perform under the CMB Contract.  In evaluating the pre-petition claims and the defenses that could be raised by both parties, the Trustee testified she believed that the chance of success on these claims was higher than the likelihood of successful recovery on the post-petition claims asserted in the APA Adversary Proceeding.  While the Trustee acknowledged the stronger basis of the estate's pre-petition claims, in negotiating the settlement amount to be paid to the estate, she was mindful of the counterarguments that could weaken the chance of success of the litigation and the potential need for extensive discovery and litigation to determine the amount of damages suffered as a result of CMB's conduct.

When the Trustee was substituted as a party to the APA Adversary Proceeding, she indicated that at first glance it appeared the post-petition counterclaim against CMB for the breach of the APA—which, if successful, would result in the Good Faith Deposit being forfeited—could be resolved through judgment on the pleadings or other dispositive motion. Upon her further analysis of CMB's allegations and claims, however, the Trustee testified that it became clear that the breach of contract allegation could not survive if the APA was deemed void due to Debtor's alleged fraud and misrepresentation. Therefore, the Trustee concluded that the APA Adversary Proceeding could not be resolved without a complete adjudication of the alleged fraud claims and a determination of, among other things, the effect of the "as is" clause in the APA versus the "turnkey" representation in the marketing material disseminated by the Debtor. The Trustee concluded, based on her analysis and judgment, that there were genuine issues whether ambiguities in the marketing materials might have entitled CMB to seek rescission. Simply stated, as the Trustee argued in her pleadings and testified at the hearing, the APA Adversary Proceeding was not a straightforward contract action, and the probability of success was uncertain. Moreover, even if the Trustee was successful on any recovery through the APA Adversary Proceeding, the litigation would then have continued as to the Deposit Adversary Proceeding to determine whether USB had a lien on any portion of the funds.

USB does not take issue with the amount of the resolution but how the settlement amount is split between pre- and post-petition claims. USB contends that part of the settlement amount should be allocated to the post-petition claims so that USB could assert its lien to the extent of the Good Faith Deposit amount. In reaching the Settlement Agreement, the Trustee concluded that the pre- and post-petition claims should be kept separate to avoid

further litigation with USB and, given the reduced likelihood of success of the latter when considering the costs involved in prosecuting the complex and contentious litigation (which costs would have inevitably exceeded $250,000.00), she determined it would be in the best interest of the estate as a whole to withdraw the defenses and counterclaims asserted in the APA Adversary Proceeding.

Notably, pursuant to the terms of the APA, for the Good Faith Deposit to become non-refundable so that CMB would have to forfeit its rights to it, CMB would have to be at fault for the breach of its obligations under the APA.[53]  If CMB was at fault, an argument could then be made that the Proposed CMB Claim Settlement, as incorporated in the APA, would become null and void so that CMB Claim would be asserted at the higher amount of $43,963,258.00—as opposed to the agreed-upon amount of $6,000,000.00.[54]  If that were the case, the CMB Claim would dwarf any other claim asserted against the estate (including any deficiency claim asserted by USB), and additional litigation would be required to seek its reduction or disallowance.  Accordingly, any recovery against CMB in addition to the Good Faith Deposit, above administrative or priority claims, would in essence be recovered—in large part—by CMB itself as the largest unsecured creditor.  For all these reasons, the probability of success in litigation weighs in favor of approving the proposed global settlement.

## 2.    *The Potential Difficulties In Any Collection*

The Trustee did not offer direct evidence of the potential difficulty in any collection against CMB if the litigation were to continue and the Trustee ultimately prevailed.  While there is no evidence before the Court to call into question CMB's solid financial standing, it

---

[53] *See* APA at § 2.1.2.
[54] *See* APA at § 1.5.

is the Court's understanding that CMB is a Danish company.  Accordingly, should the Trustee obtain a judgment against it that is not voluntarily paid, the Trustee would be required to employ extraordinary means for collection from a foreign entity.  While no concrete evidence was introduced to sway the Court in any direction, when considering the difficulties in any enforcement or collection of any judgment due to the apparent jurisdictional issues, the factor is neutral and does not weigh in the analysis.

  *3.  The Complexity and Cost of the Litigation Involved*

  The complexity and contentious nature of the litigation involved is evidenced from the testimony presented at the hearing, the exhibits introduced into evidence, and a review of the record in the main bankruptcy case as well as the adversary proceedings as a whole.  The case has been litigious from the beginning, and the costs of the litigation have been escalating as the litigation proceeds.   The expense, inconvenience, and delay that would ensue if the Court rejected the proposed Settlement Agreement is a significant factor supporting its approval.

  Without rehashing the complexity of the litigation involved, the allegations do not involve a simple breach of contract issue.  The expense of the litigation will be substantial given the number of witnesses, numerous allegations, and questions of fact involved.  The Trustee and CMB collectively identified 23 fact witnesses in their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) in the APA Adversary Proceeding (excluding duplicates).[55]   As to the pre-petition claims, the enforceability and breach of the CMB Contract would similarly require extensive discovery and possibly expert testimony to establish damages.  The expense to conduct the extensive discovery required to pursue the actions through trial would exhaust or even exceed the value of the Good Faith Deposit that

---

[55] Trustee Exs. H and I.

USB is fighting over.  Simply stated, continued litigation would be a prolonged, expensive, and complex process for an estate which is currently administratively insolvent.

At the hearing, USB questioned the Trustee whether she had considered retaining counsel on a contingency fee basis—as opposed to the current hourly arrangement she has with her counsel.  The Trustee testified she had considered such an arrangement but also noted that prior to conversion, Debtor's counsel had filed an application to be retained on a contingency fee basis, which was objected to by the United States Trustee.  The issue was then mooted by the conversion of the case to chapter 7.  Even if the engagement with Trustee's counsel was changed to a contingency fee basis, the Court cannot overlook the fact that at the present time there are no funds in the estate and any continued pursuit of the litigation would require significant expenses to be incurred out of pocket by the Trustee to pay for court reporters, transcripts, and other expenses related to litigating the complex issues with no guarantee of recovery on any of the claims.  Proceeding with the Settlement Agreement would minimize the continuing expense, inconvenience, and delay associated with continuing to litigate the issues; accordingly, this factor favors approval of the Settlement Agreement.

### 4.    *The Paramount Interest of Creditors*

While the Court acknowledges and has considered the concerns that USB raised, it finds that the paramount interest of the creditors weighs in favor of approving the global resolution with CMB embedded in the Settlement Agreement.  The settlement would enable a substantial recovery on the pre-petition claims with no continuing legal fees being incurred, while removing the risk that the Trustee might pursue the claims and lose on the merits.  The abandonment of the counterclaims and defenses in the APA Adversary Proceeding was an integral part of the global resolution of all claims as the Trustee did not want to proceed

litigating issues she deemed to be uncertain to succeed, costly to pursue, and which would result in additional ongoing litigation with USB.  Similarly, CMB would likely be reluctant to contribute funds into the estate to settle one litigation while leaving extensive claims against it still at issue in the other ongoing adversary.   From the beginning of the negotiation discussions with CMB, the Trustee had taken the position that the pre- and post-petition claims had to be kept separate to avoid the issue that any co-mingling of the Good Faith Deposit funds with the amount that the Trustee negotiated for the pre-petition claims might lead to USB's asserting a lien over funds intended to compensate the estate and other creditors for the pre-petition claims.  Accordingly, the Trustee insisted on keeping the two pots of money separate to avoid potential prejudice to creditors.

With limited exceptions, a chapter 7 trustee's principal duty is to maximize distributions to unsecured creditors, given that interests of secured creditors are usually protected by collateral.  *See In re Green*, No. 22-1293, 2022 WL 19078175, at *2 (Bankr. M.D.N.C. Dec. 8, 2022) (citing *In re Bird*, 577 B.R. 365, 375 (B.A.P. 10th Cir. 2017)).  The Handbook for Chapter 7 Trustees outlines a trustee's duties to the estate's creditors:

> A chapter 7 case must be administered to maximize and expedite dividends to creditors.
>
> A trustee shall not administer an estate or an asset in an estate where the proceeds of liquidation will primarily benefit the trustee or the professionals, or unduly delay the resolution of the case.  The trustee must be guided by this fundamental principle when acting as trustee.  Accordingly, the trustee must consider whether sufficient funds will be generated to make a meaningful distribution to unsecured creditors, including unsecured priority creditors, before administering a case as an asset case.  28 U.S.C. § 586.

U.S. Dep't of Just., Handbook for Chapter 7 Trustees, Ch. 4, § A (2012).  Had the Trustee insisted on the forfeiture of the Good Faith Deposit as part of the settlement, it could have potentially impacted the disallowance of the entire CMB Claim, thus returning CMB's claim

to the amount of over $43 million.  Any future recovery by the estate through actions brought against third parties would be distributed to any remaining administrative or priority claim and the rest would be distributed to unsecured creditors, which would be dwarfed by the CMB claim.  Said differently, the Trustee would be litigating to pursue the recovery of funds to be used in large part to repay CMB itself.

USB argued that to the extent the Trustee did not want to pursue the APA Adversary Proceeding, she had the option to abandon it so that USB could have sought to pursue it itself. There is no indication, however, that CMB would have agreed to settle the pre-petition claims if the APA Adversary Proceeding was left to be litigated.  The global settlement, on the other hand, would result in $655,000.00 to be used to pay administrative expenses, priority claims such as the claims asserted by Debtor's counsel and counsel for the Committee of Creditors, and would not only ensure CMB's cooperation with the Trustee with respect to any future litigation that she may decide to pursue against third parties related to the termination of the APA, but would also result in the withdrawal of the CMB Claim so that other creditors could recover a larger portion of any possible future recoveries.

Applying the factors described above, the Court finds that approval of the global resolution set forth in the Settlement Motion is in the best interest of the estate as a whole.

### B.       The Settlement Agreement Did Not Require USB's Consent

USB claims that the Good Faith Deposit is part of the Indenture Trustee's collateral and posits that, by settling with CMB and ascribing no value to the APA Adversary Proceeding in the global settlement, the Trustee is taking away USB's right to litigate its entitlement to the $250,000.00 held in escrow pending the outcome of the APA Adversary Proceeding.

Section 363(c)(2) provides that a trustee may not use, sell, or lease cash collateral unless the creditor with an interest in such cash collateral consents.  In turn, § 363(a) defines cash collateral as including, among other things, "cash, . . . deposit accounts, or other cash equivalent whenever acquired in which the estate *and* an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . whether existing before or after the commencement of a case under this title."  11 U.S.C. § 363(a).

USB relies on the Fourth Circuit Court of Appeal's opinion in *Old Stone Bank*, in which the court concluded that earnest money that was forfeited upon the purchasers' failure to consummate a sale was received upon disposition of the property and thus constituted "proceeds" subject to the creditor's lien.  946 F.2d 271 (4th Cir. 1991).  In *Old Stone Bank*, the bank loaned the debtor funds to purchase real estate and, in exchange, acquired a security interest in the property.  The deed of trust was broadly worded to grant the bank an interest in "all rents, issues, and profits arising from" the property in the event of debtor's default, as well as "any additional right, title or interest" in the property that might be acquired by the debtor.  The debtor eventually defaulted on the loan and a foreclosure sale ensued.  On the eve of foreclosure, the debtor filed for bankruptcy relief under chapter 11.  In the bankruptcy case, the debtor had arranged for the sale of the property, which the court authorized free of all liens, with the bank's lien to attach to the proceeds of the sale.  The potential purchaser of the property ultimately failed to close on the deal and forfeited the $100,000.00 earnest money deposit.

In concluding that the deed of trust granted the bank a security interest in the earnest money deposit, the Fourth Circuit Court of Appeals examined the deed as a whole in the context of the commercial realities present in that case.  From the outset, the court in *Old*

*Stone Bank* noted that the deed of trust unquestionably covered the property itself that was subject to the sale. The court then proceeded to address the more complicated question of whether the forfeited earnest money deposit was derived from the disposition of the collateral and may therefore be classified as "proceeds" subject to the bank's security interest. *Id.* at 273. The Court analyzed the definition of "proceeds" contained in the Virginia Uniform Commercial Code, which encompassed whatever is "received upon the sale, exchange, collection or other disposition of collateral or proceeds." Following the reasoning of two other cases, the Court concluded that a "*forfeited* earnest money deposit is received upon the disposition of property and should be classified as proceeds." *Id.* (emphasis added) (*citing In re Aldersgate Found., Inc.,* 878 F.2d 1326 (11th Cir. 1989); *In re Vandevender*, 87 B.R. 59 (Bankr. S.D. Ill. 1988)).

In rejecting the debtor's argument that there could be no substitution of collateral unless there had been a final disposition of the assets, the court in *Old Stone Bank* noted that if the proposed sale of land had been consummated, the contract contemplated that the deposit would be applied against the purchase price. *Id.* at 274. Thus, the deposit would have been undoubtedly part of the "proceeds" of the sale of the bank's collateral. *Id.* The Court could not derive any logical reasoning as to why the bank would have any less rights to the forfeited deposit solely because the sale itself had not been fully consummated. *Id.; see also Harbor E. Dev., Ltd. v. 7935 NBV, LLC (In re Harbour E. Dev., Ltd.)*, Case No. 10-20733, Adv. No. 10-03584, 2011 WL 3035287, at *4-5 (Bankr. S.D. Fla. July 22, 2011) (following *Old Stone Bank* and prior caselaw in the district in concluding that forfeited deposits are proceeds of real estate subject to the security interest of the mortgagee); *In re D & M Land Co., LLC*, No. 07-

00054, 2010 WL 358525, at *5-6 (Bankr. E.D.N.C. Jan. 15, 2010), *aff'd sub nom. In re D & M Land Co., LLC v. Branch Banking & Trust, Co.*, 431 B.R. 133 (E.D.N.C. 2010).

Acknowledging the binding precedent in this Circuit, the Court concludes that the facts of *Old Stone Bank* and other decisions following its holding are distinguishable from the facts currently before it.  Unlike in *Old Stone Bank*, while the APA was executed by CMB and Debtor, the Court <u>never</u> approved it—which was a condition precedent to the parties' obligation to consummate the sale.  More importantly, in *Old Stone Bank* and other cases following its holding, the Court found that the deposit at issue was irrefutably "forfeited" by the potential purchaser, without it being the subject of continuing litigation as to the party entitled to the funds.  USB did not cite—and acknowledged at the hearing that it was not aware of—any caselaw directly on point where the good faith deposit on which a secured lender was asserting a security interest had not been forfeited but was rather part of litigation in which the bankruptcy estate was involved and which the Trustee was pursuing.  The Court is also unaware of any case that addressed the issue under the facts currently before it.

The appeal before the Fourth Circuit Court of Appeals in *Old Stone Bank* involved "a dispute between a secured creditor and the bankruptcy estate of a debtor over an earnest money deposit **forfeited** when the sale of the real estate securing the debt failed to close."  *Id.* at 272. That is not the case here.  Notably, "forfeiture" is defined as:

> 1. The divestiture of property without compensation. 2. The loss of a right, privilege, or property because of a crime, *breach of obligation*, or neglect of duty.  Title is instantaneously transferred to another, such as the government, a corporation, or a private person.  3. A destruction or deprivation of some estate or right because of the failure to perform some contractual obligation or condition.[56]

---

[56] *Forfeiture,* BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added).

Here, CMB never "forfeited" the funds.  While CMB deposited the Good Faith Deposit into escrow, consistent with the provisions of the APA, the deposit would become non-refundable upon CMB being selected as the stalking horse bidder, "unless [CMB's] failure to close is no fault of [CMB]."  Said differently, the Good Faith Deposit was refundable—even if CMB were selected to serve as the stalking horse bidder—if the failure to close on the transaction was concluded to be a result of Debtor's fault.  The determination of the party at fault for the termination of the APA is the underlying issue of the APA Adversary Proceeding—the very same issue that the Trustee is attempting to resolve as part of the global resolution sought in the Settlement Motion.  While the sale did not close in this case, the key fact distinguishing this case from the situation in *Old Stone Bank* is that here the deposits were not "forfeited" and thus did not become part of the "proceeds" to which USB is entitled.

The Trustee claims there is no evidence that USB's security interest extends to the "proceeds" of the assets that were the subject of the APA.  At the hearing, USB referred to the loan documents attached as an exhibit to its initial motion for relief from stay filed in the bankruptcy case, which included the security agreement and mortgage document.[57]  USB did not seek to have the document introduced into evidence.  It did ask the Court, however, to take judicial notice of the document and further introduced into evidence a redacted email dated June 12, 2023 between USB's counsel and counsel for the Trustee in which USB's counsel posited: "Our client does have a valid lien on the deposit posted by CM Biomass. Both the mortgage and security agreement provide that our liens attach to the proceeds of collateral."[58]  Citing to *Old Stone Bank*, USB's counsel further noted in the email that "binding Fourth Circuit precedent provides that a post-petition deposit from a defaulting buyer is

---

[57] ECF No. 69.  *See, e.g.*, ECF Nos. 69-3 at pp. 4-5 and 69-4 at p. 3.
[58] *See* USB Ex. 2.

subject to a pre-petition secured lender's liens." Even assuming that USB's interest extended to the "proceeds" from the sale of any collateral, the Court is not swayed to reach a different conclusion. The definition of "proceeds" under the South Carolina Commercial Code[59] encompasses, among other things, "whatever is *acquired*[60] upon the sale . . . or other disposition of collateral," "whatever is *collected*[61] on, or distributed on account of, collateral"; and "*rights*[62] arising out of collateral."[63] USB did not have control, possession, or a just claim to the Good Faith Deposit as the Court never entered an order approving the sale with any liens of secured creditors to attach to the proceeds, as contemplated pursuant to section 363. Not only was the sale not approved, but, unlike in *Old Stone Bank*, the Good Faith Deposit remained in escrow subject to CMB's claims that it was refundable to it and thus never vested to the bankruptcy estate. As the parties themselves previously acknowledged in the Escrow Consent Order, the ownership of the Good Faith Deposit was in dispute and subject to determination through further order of the Court. Any valuable right that USB may have in the Good Faith Deposit is—and always has been—conditioned on the Trustee's prevailing on her counterclaim and defenses to the APA Adversary Proceeding. The Trustee has the right

---

[59] See ECF No. 69-3. Pursuant to the Mortgage, Security Agreement, and Assignment of Rents and Leases it appears that the South Carolina Uniform Commercial Code would apply to interpret the definition of "proceeds" in this case.

[60] The term "acquire" is defined as "to gain possession or control of, to get or obtain." *Acquire,* BLACK'S LAW DICTIONARY (11th ed. 2019).

[61] The verb "collect" is defined as "to gain or regain control of", "to claim as due and receive payment for", and "to get and bring with one". *Collect,* https://www.merriam-webster.com/dictionary/collect (last visited Dec. 13, 2023).

[62] "Right" is defined as "[s]omething that is due to a person by just claim, legal guarantee, or moral principle . . . , a power, privilege, or immunity secured to a person by law . . . , [t]he interest, claim, or ownership that one has in tangible or intangible property." *Right,* BLACK'S LAW DICTIONARY (11th ed. 2019).

[63] *See* S.C. Code Ann. § 36-9-102(64)(A)-(C). The definition also encompasses "to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral" and "to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral." *Id.* at § 36-9-102(64)(D)-(E). The definitions in (D) and (E), however, do not appear to be applicable to the facts of this case.

and standing to pursue these counterclaims against CMB pursuant to the duties set forth in 11 U.S.C. § 704(a)(1) ("The Trustee shall—(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest.").

Based on the facts of this case, the lack of any binding precedent which specifically addresses the extent to which a security interest attaches to escrowed deposits that are <u>not</u> forfeited and remain the subject of litigation in the context of a sale that was never approved by the Court, the substance of the transaction at issue, and the extent to which "proceeds" attach under the South Carolina Commercial Code, the Court concludes that USB's security interest does not extend to the escrowed Good Faith Deposit.  For the reasons set forth above, the Court is not persuaded by USB's argument that the agreement is unfair and that the Trustee wrongfully terminated USB's interest in the Good Faith Deposit.

While USB did not directly raise such argument, the Court further notes that consolidating the APA Adversary Proceeding with the Deposit Adversary Proceeding did not give rise to USB's need to consent to the dismissal of the APA Adversary Proceeding.  As had been acknowledged and discussed during the hearing on the motion to consolidate the action, the "consolidation" was more for efficiency purposes so that discovery could be conducted and pleadings filed in one proceeding.  USB acknowledged at that hearing, however, that such consolidation did not change the nature or separateness of the two proceedings, which could be "bifurcated" at any point.[64]

---

[64] *See supra* at fn. 44.

## CONCLUSION

For the foregoing reasons, the Trustee's Settlement Motion is granted, and the Settlement Agreement is approved.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**12/15/2023**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 12/15/2023